## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE APPLICATION FOR ACCESS | § | Case: 1:23–mc–00133 |
| TO GRAND JURY MATERIALS | § | Assigned To : Reyes, Ana C. |
| RELATING TO HACK OF | § | Assign. Date : 12/7/2023 |
| DEMOCRATIC NATIONAL | § | Description: Misc. |
| COMMITTEE | § | |

## APPLICATION FOR ORDER AUTHORIZING THE RELEASE OF CERTAIN GRAND JURY MATERIALS

Pursuant to Local Rules 57.6 and 6.1, Ryan Milliron, Pro Se, respectfully requests that this Court issue an order pursuant to Federal Rule of Criminal Procedure 6(e) authorizing the release of: (1) All portions of Grand Jury materials relating to the roles of Rodney Joffe, Manos Antonakakis, and David Dagon in the investigation into the hack of the Democratic National Committee; (2) any transcripts of underlying grand jury testimony or grand jury exhibits that relate to evidence provided or influenced by Joffe, Dagon, or Antonakakis; (3) any transcripts of underlying grand jury testimony or grand jury exhibits that relate to evidence provided or influenced by entities tied to Rodney Joffe, including: (a) Packet Forensics (b) Neustar (c) ERP Services (d) Vostrom Holdings; (e) Internet Media Network (4) any transcripts of underlying grand jury testimony or grand jury exhibits that relate to evidence provided or influenced by the Defense Advanced Research Projects Agency ("DARPA") or more broadly, the Department of Defense ("DOD").

In addition, Applicant respectfully requests this Court conduct an In-Camera review on the totality of investigative materials relating to the hack of the Democratic National Committee stemming from Joffe, Dagon, and Antonakakis to assist the Court in identifying the full extent of prosecutorial misconduct and government misstatements, and to better inform the grounds of Applicant's limited request for materials here, as well as to ensure the interests of justice are served and safeguarded against what may be a meritless indictment.

**PRELIMINARY STATEMENT AND INTEREST OF THE APPLICANT**

Applicant is an independent journalist that has obtained knowledge of highly exculpatory information bearing on *United States v Netyksho*, Case No. 1:18-cr-00215-ABJ and raising questions about the conduct of government officials in relation to the investigation underpinning the case.

Slowly, what was once a broad narrative regarding a vast Russian conspiracy to interfere with our election has crumbled under scrutiny. Behind each pile of rubble, operatives connected to the Hillary Clinton campaign have been exposed. The last piece of this story is related to the alleged hack of the Democratic National Committee in April 2016. Was this a conspiracy by the Russian government? Or was it the opening salvo of a scheme by operatives tied to Hillary Clinton to create the right environment to launder the Steele dossier and other claims to the media?

Despite numerous investigations, nobody has ever properly examined the conclusions of Special Counsel Robert Mueller on the hack of the Democratic National Committee.  It is time for more transparency.

## BACKGROUND

### A. Government Used Information From and Tasked Operatives Tied To Hillary Clinton

During the 2016 election, Hillary Clinton effected a campaign to play up claims of Russian interference and a collusion narrative against her opponent, Donald Trump. As part of these efforts, cyber researchers Manos Antonakakis and David Dagon of Georgia Tech provided analysis and alleged authorship to a set of allegations making claims of a secret communications channel between Trump and Vladimir Putin, allegedly using intermediary connections through Alfa Bank and Spectrum Health, hereafter referred to as the "Alfa Bank allegations."

Special Counsel Durham alleged in the indictment of Michael Sussmann that these researchers were tasked by Rodney Joffe to establish evidence supporting an "inference" and "narrative" regarding Trump that would please certain "VIPs"[1]...", later identified as the Hillary Clinton campaign.  These three cyber researchers as a group were in communication with

---

[1] See https://www.justice.gov/sco/press-release/file/1433511/download. Accessed December 6, 2023.

members of the Clinton campaign and Fusion GPS, an opposition research firm hired by Perkins Coie who in turn contracted Christopher Steele to compile a dossier on Donald Trump.

The allegations were deeply flawed, and have been widely discredited by the FBI, CIA, and numerous independent reviews, some of which allege the incomplete data was the result of manipulation by someone with malicious intentions. FBI efforts to corroborate the allegations included obtaining data logs from the host of the marketing server, and they could not establish the legitimacy or authenticity of the data.

Public reporting establishes that work on the Alfa Bank allegations, as it relates to Antonakakis and Dagon, occurred during the period of June 14, 2016 through September 19, 2016. During this same period in which they had been tasked to establish an "inference" and "narrative" satisfactory for Hillary Clinton, Antonakakis and Dagon also provided the United States government with an attribution analysis on the hack of the Democratic National Committee, which was dated August 7, 2016.

This attribution analysis was provided first to the Defense Advanced Research Projects Agency ("DARPA"). DARPA has in the past denied any role in investigating the hack of the DNC. Specifically, Jared Adams, Chief of Communications for DARPA stated "DARPA was not involved in efforts to attribute the DNC hack. Dr. Antonakakis worked on DARPA's Enhanced Attribution program, which did not involve analysis of the DNC hack. Further, DARPA was not involved in efforts to attribute the Guccifer 2.0 persona, nor any involvement in efforts to attribute the origin of leaked emails provided to Wikileaks."[2]

This denial was in response to media inquiries related to numerous emails obtained via Applicant's Open Records requests in which Antonakakis and Dagon referenced working on the DNC hack investigation and providing materials to Special Counsel Robert Mueller. Additional inquiries by Senator Chuck Grassley resulted in a September 2022 letter from DARPA admitting their previous response to the media inquiries was wrong, but attempted to downplay the work of the researchers as only a "test of capabilities"[3]:

---

[2] See https://www.washingtonexaminer.com/news/justice/durham-related-emails-prompt-darpa-to-deny-involvement-in-attributing-2016-dnc-hack-to-russia. Accessed October 10, 2023.
[3] See https://www.grassley.senate.gov/imo/media/doc/darpa_to_grassley_johnson_-_crossfire_hurricane.pdf.

> The enclosed August 7, 2016, document titled "Fancy Bear / APT28 Attribution Analysis" may correspond to the "Whitepaper on DNC attack attribution" referenced in the April 28 letter.  Before the start of the EA program, the Georgia Tech team conducted research on the publicly-reported July 2016 Fancy Bear/APT-28 campaign and provided the results to researchers at DARPA, likely to highlight the capabilities of their technical approach.  The Georgia Tech team had submitted a proposal for work on the EA program and had been notified they had been selected to negotiate on a contract award, but the research conducted in this report was done of their own volition and was not paid for by DARPA.  The document provides an analysis of the origins of the command-and-control (C2) servers, observations about the domain registrar system used by attackers, and indicators of the attack domains being resolved by other sensitive networks.

This analysis provided information highly material to the government's attribution of the hack to Russia and may form the basis of the October 7, 2016 joint-attribution statement from the Department of Homeland Security and Office of the Director of National Intelligence.[4]

DARPA also suggested that this attribution analysis was of the researchers "own volition." The cyber researchers tell a much different story. In an email to colleagues at Georgia Tech, Antonakakis suggested that DARPA itself had tasked him to look into the hack of the DNC:

> Finally, I will leave you with an anecdote and a thought. During one of my interviews with the Special Counsel prosecutor, I was asked point blank by Mr. DeFilippis, "Do you believe that DARPA should be instructing you to investigate the origins of a hacker (Guccifer_2.0) that hacked a political entity (DNC)?" Let that sync for a moment, folks. Someone hacked a political party (DNC, in this case), in the middle of an election year (2016), and the lead investigator of DoJ's special council would question whether US researchers working for DARPA should conduct investigations in this matter is "acceptable"! While I was tempted to say back to him "What if this hacker hacked GOP? Would you want me to investigate him then?", I kept my cool and I told him that this is a question for DARPA's director, and not for me to answer.

(Emphasis added. Excerpted from Exhibit 1.)

Another email from David Dagon's attorneys summarized certain documents, again referencing providing work to Special Counsel Robert Mueller:

---

[4] Exhibits 147 and 151 as presented at the trial of Michael Sussmann indicate that as of October 2016 the government had not obtained any forensic information or data from Crowdstrike or the DNC. This offers the question of what the government was relying on for official attribution of the hack to Russia.

On Jul 23, 2021, at 3:30 PM, Jody R Westby <westby@globalcyberlegal.com> wrote:

Beth,
At our direction, David made a list of documents/data sources that he thought would be responsive to the subpoena. They are:
DARPA whitepapers
Whitepaper on DNC attack attribution
Analysis of attacks of EOP (Executive Office of the President) networks
Whitepaper for DOJ on APT-29 related hackers, crypto coin transactions, and analysis that includes Yota-related domains
"Mueller List" - list of domains and indicators related to APT-28

BLU Phones directory of files

Rhamnousia chat logs

We may have further information after we are able to speak to our client, but not sure when that will be at this point.   Hope this is helpful to you.
Kind regards,
Jody

(Emphasis added. Excerpted from Exhibit 2.)

Applicant has obtained a set of highly redacted "Rhamnousia chat logs" which indicates that the August 7, 2016 attribution analysis was sent between 2am and 3am to the personal email accounts of officials at DARPA, including Angelos Keromytis and Tejas Patel. This is inconsistent with DARPA's representation to Senator Grassley that their work was only a "test of capabilities."   Notably, their attribution analysis arrived weeks before the redacted reports from Crowdstrike were received by the FBI.

In a September 2020 letter sent by attorneys for David Dagon, the attorneys indicate the work of the cyber researchers was done at the tasking of the Department of Justice and that, they knew their work was being provided "via DARPA" to the Department of Justice and Special Counsel Robert Mueller team[5]:

---

[5] In recent years DARPA has moonlighted as the investigative arm of the Department of Justice. This includes the investigation into the October 2018 Tree of Life Synagogue attack. On November 15, 2018, US Attorney Scott Brady sent a letter to Steven Walker, then the Director of DARPA, requesting the Department of Defense's assistance in their criminal investigation, specifically relating to the defendant's online activities. In less than a day, a DARPA official named Christopher Schneck forwarded the request for assistance to Manos Antonakakis, a private contractor for DARPA, for further action.

Work Performed by Mr. Dagon for Georgia Tech That is Subject to the Investigation

The work that Mr. Dagon did on attribution analysis of communications traffic, which relates to the current legal matter, involved research on the Democratic National Convention hack, the Advanced Persistent Threat-28 (APT-28) malware, analysis of potential attack traffic related to the 2016 election (including traffic between the Trump Organization, Spectrum Health, and Alfa Bank), and analysis of Yota phone communications traffic. This work is no less within the scope of Mr. Dagon's employment than the work he did on the Mariposa botnet.

Indeed, much of this work was done in preparation for and in fulfillment of the obligations of the multi-million-dollar DARPA contract he helped bring to Georgia Tech (and about which the University similarly issued a press release). To suddenly decide that this attribution work was "not within the scope of Mr. Dagon's employment" would, of course, put this finding at risk, and would similarly implicate any remedies or defenses the University may have under O.C.G.A. 50-21-25, not only with respect to the Durham investigation, but generally. In short, Mr. Dagon's attribution research was not a frivolous pursuit, but was integral to the research he secured for Georgia Tech. Any assertion to the contrary is disingenuous.

As we noted in our previous call, when Mr. Dagon undertook a thorough review of work related to the investigation, which was performed from the end of 2016 forward, *he discovered that almost all of the initial work performed by him was on behalf of Georgia Tech under the DARPA contract: the work related to queries submitted by the U.S. Department of Justice (DOJ) through DARPA regarding Russian communications between Alfa Bank and the Trump organization and Mr. Trump's use of a Russian Yota phone — the exact subject matter of the criminal Grand Jury subpoena that Mr. Dagon received from the Durham investigation.* The requests were sufficient to require Mr. Dagon and Prof. Antonakakis ("Manos") to set up a file within the DARPA project called "DOJ" and a sub file called "Mueller" because they knew that these requests were coming from DOJ and being sent back (via DARPA) to DOJ and the Mueller investigation.

This is precisely what the Durham investigators are looking at – the work Mr. Dagon did under the DARPA contract on behalf of Georgia Tech. In particular, the research he conducted on DNS records starting in late 2016 and continuing through early 2017, and the research he conducted related to the Yota phone were always conducted as part of Mr. Dagon's duties as a security researcher employed by Georgia Tech.

This work was in furtherance of his duties and obligations at Georgia Tech; it was for the benefit of Georgia Tech; and it was within the scope of his employment at Georgia Tech. In addition, his response to first the FBI/DOJ inquiries that were made through DARPA, and his later response to the grand jury subpoena and other investigative queries have always been within the scope of his employment and meticulously coordinated with his employer.

(Emphasis added. Excerpted from Exhibit 3.)

DARPA has executed several memorandums of understanding ("MoU") in order to assist the Federal Bureau of Investigation. One of these MoU's is between DARPA and the counterintelligence division of the FBI. Another MoU is more specific to the New York Field Office which handles international investigations. Broadly speaking, these MoU's gave authority to DARPA to assist FBI investigations.[6]

Two other MoU's are between DARPA and the National Cyber Investigative Joint Task Force ("NCIJTF"), which numerous American intelligence agencies are a party to. It remains unclear if the attribution materials were provided via DARPA to the DOJ pursuant to one or more of these MOU's or another arrangement.

---

[6] DARPA in turn, has allowed private contractors to work on these taskings. This creates unprecedented questions for the court regarding the chain of custody for evidence and the production of Brady material when, as is the case here, those private contractors have a history of lobbing spurious allegations and engaging in political smear campaigns.

The letter from Mr. Dagon's attorneys focuses on Alfa Bank and Yota Phone allegations, which were the primary drivers of legal expenses Dagon was incurring (and which was the subject of the letter). However, there is no indication that after Mueller was appointed in May 2017 that those matters were still being investigated. Testimony and exhibits shared during the Sussmann trial indicated the Alfa Bank investigation was closed on January 18, 2017.[7]

It appears likely that materials flowing to Special Counsel Mueller primarily related to the hack of the DNC, and were in addition to the attribution analysis from August 7, 2016. Questions remain outstanding to what extent Rodney Joffe provided information relating to the hack of the Democratic National Committee. Sources developed by Applicant indicate that Mr. Joffe separately provided the US government work relating to the hack of the Democratic National Committee, and when added together, the work of these Clinton-connected cyber researchers form a central and essential foundation for the *Netyksho* case.[8]

The arrangement of DARPA serving as an intermediary between Special Counsel Mueller and the cyber researchers raises the specter that it served as a means to obfuscate or hide the roles of the Clinton-connected cyber researchers from the Court, the public, and Congressional oversight.

### B.  In Failing to Seek Exculpatory Evidence, The Government Permanently Suppressed It

David Dagon was identified in early October 2016 as the author of the Alfa Bank allegations by Rodney Joffe, a Confidential Human Source ("CHS")  for the FBI, as well as an additional unnamed CHS. FBI field agents, including Allison Sands and Curits Heide, desired to interview Dagon but were rebuffed by the FBI leadership. Knowing that Dagon had already provided attribution analysis on the DNC hack, we are left to wonder whether the US government had already placed reliance on their work in naming Russia responsible for the alleged hacking efforts. Interviewing David Dagon for the Alfa Bank matters would have

---

[7] See https://www.documentcloud.org/documents/22046248-0233. Closing Memorandum.
[8] For transparency to the Court, Applicant previously made inquiries in March 2023 to Steven Tyyrell, attorney for Rodney Joffe, regarding Mr. Joffe's role in the DNC hack investigation. Applicant's inquiry was met with an unequivocal denial that Mr. Joffe was involved in any respect with the investigation into the hack of the DNC and went on to notify Applicant of a pending defamation lawsuit against him, which has not been filed. The basis for this threat remains unclear.

created, at minimum, a strong basis for impeachment which would have damaged the government's case in *Netyksho* as well as the official attribution for the alleged hack to Russia.

The government knew that the Alfa Bank cyber researchers were connected to Hillary Clinton. The first indication was that Michael Sussmann, a prominent lawyer for the DNC and Clinton campaign had been the one to bring the allegations on September 19, 2016. This relationship is important to note, because Michael Sussmann was **also** the point person on behalf of the Democratic National Committee for matters pertaining to the alleged hack.

That Dagon was later identified as the author of the Alfa Bank white paper was enough to establish Dagon as someone likely in contact with the Clinton campaign. In addition, Rodney Joffe approached FBI agent Thomas Grasso regarding the Alfa Bank allegations in October 2016.

The second indication was that the government had obtained a copy of the Cody Shearer dossier in September 2016 from Christopher Steele, given first to Jonathan Winer at the State Department. Within the Shearer dossier is an allegation based on a reported conversation between Bob Baer and Shearer that "the Russians had established an encrypted communication system with a cut out between the Trump campaign and Putin."

This was publicly reported in April 2018, months before the indictment in *Netyksho* by Lee Smith of *Real Clear Investigations*. As part of that reporting, Bob Baer was quoted as placing the Shearer conversation in March or April of 2016.[9]

The government had a clear obligation to investigate this, because it would establish that the Clinton campaign was aware of the Alfa Bank allegations months before the cyber researchers have suggested they started looking for it, and weeks before the alleged Alfa Bank DNS lookups even began, which would undermine their independence and credibility. The government knew that Steele and Shearer were working for Hillary Clinton, and should have made inquiries on the extent of the relationship between the Alfa Bank cyber researchers and the Clinton campaign.

Instead of interviewing these individuals, the Department of Justice tasked them to provide work to Special Counsel Mueller. In failing to pursue questions easily within their purview, the government suppressed impeachment material and committed an irreversible Brady violation.

---

[9] See https://www.realclearinvestigations.com/articles/2018/04/25/test.html.

## C.  **The Government Failed To Investigate Similarities**

The involvement of researchers connected to the Clinton campaign in yet another episode of the Russian interference narrative is ominous. Applicant asks this court to take note of other claims touted in the media like the Steele dossier and Alfa Bank allegations, which were found to have contained apparent, and in some proven instances, fabricated evidence. The process to link Clinton to each of those was arduous, creating a years-long media campaign based on what was at best, politically tainted information.

There is no information in the public record that suggests that the FBI or any number of investigations subsequent to the Mueller investigation, ever took a second look at the facts around the hack of the Democratic National Committee. There are a series of events that raise questions over the legitimacy of the *Netyksho* prosecution.

On June 14, 2016 the alleged DNC hack was disclosed and members of the Clinton campaign were quoted in a series of stories in the media. Most prominent among these stories was an article published in the *Washington Post* titled "Russian government hackers penetrated DNC, stole opposition research on Trump".[10]

Testimony from Shawn Henry on December 5, 2017 before the Permanent Select Committee on Intelligence was that Crowdstrike had no concrete evidence that any files had been exfiltrated.[11] If they had no evidence that files had been stolen, how could the *Washington Post* offer the prescient prognostication that the Russians had specifically stolen the opposition research?

Just one day later, "Guccifer 2.0" emerged with a public persona inconsistent with the prior operations of "APT-28", the alleged Russian hacking group which is the subject of the *Netyksho* prosecution. There was no apparent value to this emergence, as the hackers could have simply leaked the emails to Wikileaks and stayed in the shadows. Instead, Guccifer 2.0 in his first blog shared the Democrat opposition research document on Donald Trump, just as the *Washington Post* predicted. Suddenly, millions of Americans were reading collated dirt on

---

[10] See
https://www.washingtonpost.com/world/national-security/russian-government-hackers-penetrated-dnc-stole-opposition-research-on-trump/2016/06/14/cf006cb4-316e-11e6-8ff7-7b6c1998b7a0_story.html.

[11] See https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Shawn_Henry-MTR_Redacted.pdf at 32.

Donald Trump. As part of this, Guccifer 2.0 undertook a series of specific steps needed to inject Cyrillic characters into the document for no apparent reason other than to leave evidence pointing at Russia behind.

Specifically, with Russian language settings enabled and using Word 2007, Guccifer 2.0 opened the document and would have found pop up boxes notifying the user that errors had been found in the document, offering a recovery attempt. After the user attempted to recover the document's content, they saved the document using RTF format, the only file format that would inject Cyrillic characters into broken hyperlinks.[12]

This was in addition to the use of a computer profile in the name of Феликс Эдмундович (Felix Edmundovich), the founder of a Soviet police force. Using this profile, Guccifer 2.0 made insignificant changes to the documents and injected metadata containing this Russian profile into the documents.

Democrat operatives utilized similar procedures in the manufacture of tens of thousands of fake Russian twitter bots, which primarily used Cyrillic characters in the names and profiles of the bot accounts.[13] These operatives of New Knowledge and Hamilton-68 then asked the American people to believe that a Russian intelligence operation was behind an influence campaign, but had made the mistake of accidentally using Cyrillic characters in the profile names. At least one of these operatives, Mikey Dickerson, is also believed to be affiliated with the investigation into the Alfa Bank allegations on behalf of the United States Senate.

The government has also failed to investigate certain idiosyncrasies between the Alfa Bank cyber researchers and Guccifer 2.0. This includes the use of Wordpress websites to market their materials, and the use of the Mediafire fileshare website to share documents and data. This is evidenced on October 4, 2016 when both Guccifer 2.0 and an individual connected to the Alfa Bank data both making uploads to Mediafire within hours of each other.[14]

---

[12] See https://theforensicator.wordpress.com/did-guccifer-2-plant-his-russian-fingerprints/.  Independent analysis of initial documents released by Guccifer 2.0.

[13] See https://www.nytimes.com/2018/12/19/us/alabama-senate-roy-jones-russia.html. NYT article on Project Birmingham.

[14] See http://www.mediafire.com/file/qc68pt5k6wn9f64/gdd.zip (Alfa Bank data) and http://www.mediafire.com/file/cqri63jyzrh6piv/cf.7z  (Guccifer 2.0 release).

### D.  Prosecutorial Misconduct

In light of the cyber researchers' work on the Alfa Bank allegations and their association with the Clinton campaign, significant disclosures should have been included in all affidavits produced by the government over the life of the *Netyksho* case. Instead, the government began tasking these cyber researchers through the Department of Justice and Special Counsel Robert Mueller.

If Rodney Joffe provided any information on the hack of the DNC to the government, additional necessary disclosures would have included whether the government had ever engaged Joffe as part of covert cyber operations to spoof data or DNS activity; corrupt datasets; fabricate SSL certificates; or surreptitiously harvest data or whether the government had any suspicions of such activity.[15]

The full extent of prosecutorial misconduct can only be understood through disclosures from the government detailing all work product received from the 3 cyber researchers, and any interactions and taskings from the Department of Justice or Special Counsel Mueller team. In light of the destruction of phone evidence on the Mueller team[16], significant exculpatory evidence may depend on the fading memories of the Mueller team members containing the substance of any interactions with the cyber researchers and any intermediaries, including at DARPA.

### E.  Procedural History

Rule 6(e)(3)(E)(i) gives the court broad discretion in permitting the disclosure of grand jury materials "preliminarily to or in connection with a judicial proceeding." One seeking

---

[15] Applicant has learned from a FOIA request that Rodney Joffe's top secret security clearance is held by the National Security Agency. As part of his extensive ties to the government, Joffe has received tens of millions of dollars worth of contracts, and provides highly classified surveillance equipment to the US intelligence community. In addition, Joffe maintains ties to a series of shell entities, including corporations registered in Panama and Saint Kitts & Nevis, entities which have been publicly reported to host apps that surreptitiously harvest user data for provision to the US intelligence community.. See
https://www.washingtonpost.com/technology/2022/11/08/trustcor-internet-addresses-government-connections/ and
https://www.wsj.com/articles/apps-with-hidden-data-harvesting-software-are-banned-by-google-11649261181.
[16] See
https://www.nationalreview.com/news/grassley-demands-explanation-from-doj-on-mueller-teams-wiped-phones-questions-whether-it-was-widespread-intentional-effort/.

disclosure under Rule 6(e) is normally required to make a showing of a "particularized need" in order to obtain access to grand jury materials. *Illinois v. Abbott & Assocs., Inc.*, 460 U.S. 557 (1983). This typically means "(1) [the] material sought is needed to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure is greater than the need for continued secrecy; and (3) the request is structured to cover only material so needed. In re Sealed Case, 801 F.2d 1379, 1381 (D.C. Cir. 1986) (quoting, inter alia, *Douglas Oil Co. of Cal. v Petrol Stops* NW., 441 U.S. 211, 222 (1979)) (brackets omitted).

The history of Rule 6(e) motions shows a mix of successful and unsuccessful petitions, each highly dependent on the facts surrounding the applications as one would expect. One recent granted application was in *Committee on the Judiciary v. United States Department of Justice*, No. 19-5288 (D.C. Cir. 2020) [later vacated on other grounds] requesting Grand Jury materials from Special Counsel Mueller's investigation, which was granted in connection with their broad impeachment investigation into President Trump.

In addition to a glaring need to inform the public about these matters[17], the requested disclosures will aid Applicant in ongoing FOIA litigation (cases 1:2022cv00782, 1:2023cv00030, 1:23-cv-01222 - Western District of Michigan) where the government has refused to confirm or deny the existence of documents relating to these Clinton-connected cyber researchers pertaining to the DNC hack investigation.

## ARGUMENT

### A.  The Material Sought Is Needed To Avoid A Possible Injustice

More than 5 years after the Grand Jury proceedings relating to the *Netyksho* case concluded, the defendants have not been apprehended. The government has not dismissed their case and none of the subsequent investigations, including from Special Counsel John Durham, have revisited the facts that are foundational to the government's case.

---

[17] The public largely still believes, falsely, that the government relied on the work of Crowdstrike, a third party vendor contracted by the DNC during 2016. Exhibits 147 and 151 of the Sussmann trial show that by October 2016, the FBI was still requesting forensic data, images, and information from Crowdstrike and it appears unlikely that the October 7, 2016 official attribution statement relied on evidence from Crowdstrike.

One of the questions central to Applicant's desires is whether the Department of Justice complied with department regulations regarding exculpatory evidence before grand juries. Specifically, DOJ Rule 9-11.233 states:

> **"It is the policy of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person. While a failure to follow the Department's policy should not result in dismissal of an indictment, appellate courts may refer violations of the policy to the Office of Professional Responsibility for review."**

Here, the government not only knowingly accepted and relied on materials provided by operatives tied to Hillary Clinton and the Alfa Bank allegations, the government actually tasked the cyber researchers to provide additional information.

The government should have disclosed the contacts and taskings of the cyber researchers as exculpatory information in all affidavits relating to information they had provided. The government would also have a clear obligation in the *Netyksho* case to disclose the requested information pursuant to *Brady v Maryland* (1963).

Applicant has undertaken a years-long public investigation into these matters, obtaining documents via Open Records requests that have prompted inquiries from both sides of the political aisle.[18] This work recently culminated in a co-written article with Matt Taibbi centering on the role of these Clinton-connected cyber researchers in the DNC hack investigation.[19]

Now, these requested disclosures are necessary. In response to Applicant's FOIA DF-2022-00400 requesting "any files in DNI's possession relating to attribution work done on the hack of the Democratic National Committee by the Russians in 2016 that originated with or was influenced by, Rodney Joffe, David Dagon, Manos Antonakakis, Angelos Keromytis, or Tejas Patel", the Office of the Director of National Intelligence refused to confirm or deny the existence of responsive records. Likewise, a FOIA request 1558747-000 to the FBI requesting

---

[18] Senators Chuck Grassley and Ron Johnson have made numerous inquiries based in part on Applicant's work, see https://www.grassley.senate.gov/imo/media/doc/johnson_grassley_to_darpa.pdf (April 28, 2022). Senator Ron Wyden has also made inquiries, also relying in part on documents obtained by Applicant. See https://www.wyden.senate.gov/imo/media/doc/Signed%20Neustar%20letter%2012.15.22.pdf. (December 15, 2022).
[19] See https://www.racket.news/p/forget-collusion-was-interference.

"any reports, emails, memorandums, or letters in the FBI's possession relating to the hack of the DNC or Guccifer 2.0 that were provided by David Dagon or Manos Antonakakis", was met with a refusal to confirm the existence of records.

Applicant endeavors to present the full story to the American public on what is facially a corrupt Mueller investigation. The requested disclosures will aid the Applicant in his continued FOIA efforts and litigation where he is seeking answers on behalf of the American public. If the logical series of questions raised by this filing and the desired disclosures results in the expected exoneration of the Russian defendants in *Netyksho*, it will far surpass the abuses witnessed against Senator Ted Stevens. Applicant hopes that if this comes to fruition, that it will come without a trial and improper conviction as the late Senator was forced to endure. More troublingly, it will mean there are malicious actors that still need to be held to account for the crimes they committed.

The American system of justice is one that affords all defendants due process under the law. It is a system that disfavors backroom dealing and encourages openness to proceedings as a check against prosecutorial misconduct and improper influence over independent grand juries. Now, it is vital that we are able to assess the government's conduct before the grand jury and whether they crossed a line to improperly infringe upon the grand jury's independence.

### B.  The Need For Disclosure Is Greater Than The Need For Continued Secrecy

The alleged hack of the Democratic National Committee occurred over 7.5 years ago during the 2016 election.  The indictment in *Netyksho* occurred over 5 years ago, and Special Counsel Mueller concluded his work with a written report released in early 2019. Through the date of Mueller's report release, major media outlets devoted extraordinary amounts of time on case developments, rumors and leaks. There is no investigation in the modern era that has commanded more public interest.

Given that the grand jury concluded its work years ago and the knowledge of the cyber researchers' ties to this investigation is now a matter of public record, the need for continued secrecy is negligible.

Instead, there is an unrelenting need to provide transparency to the American people over inexplicable government and prosecutorial decisions in this case and the investigation of the hack of the Democratic National Committee.

There is an additional need to correct the public record relating to public statements by government officials that are erroneous. A common understanding for the public is that the government worked in partnership with Crowdstrike, an IT vendor contracted by the Democratic National Committee during 2016 to analyze the DNC's compromised systems, and in some form took information from Crowdstrike and corroborated it (while not getting direct access to the DNC servers themselves). This false narrative was bolstered by misleading statements such as the June 8, 2017 testimony from former FBI Director Jim Comey in the following exchange:

> **COMEY:** In the case of the DNC, and I believe the D triple C, but I'm sure the DNC, we did not have access to the devices themselves. We got relevant forensic information from a private party, a high class entity, that had done the work but we didn't get direct access.
>
> **BURR:** But no content.
>
> **COMEY:** Correct.
>
> **BURR:** Isn't content an important part of the forensics from a counter-intelligence standpoint?
>
> **COMEY:** It is but what was briefed to me by the people who were my folks at the time is that they had gotten the information from the private party that they needed to understand the intrusion by the spring of 2016.

This testimony is misleading, suggesting that the FBI had obtained everything they needed from Crowdstrike soon after the hack of the DNC, which occurred in April 2016. Yet, as shown by Defense Exhibits 147 and 151 of the Michael Sussmann trial, the FBI had apparently not received anything but redacted Crowdstrike reports by October 2016 and had obtained little-to-no data or forensic information, which was still being requested by the FBI:

-------- Original message --------
From: "Hawkins, E. A. (WF) (FBI)" <Adrian.Hawkins@ic.fbi.gov>
Date: 09/30/2016 6:10 AM (GMT-08:00)
To: "Sussmann, Michael A. (Perkins Coie)" <MSussmann@perkinscoie.com>, "Newel , Sean (NSD) (JMD)"
<Sean.Newel@usdoj.gov>
Cc: "Lai, Sarah (NSD) (JMD)" <Sarah.Lai3@usdoj.gov>, "Snih, Jeffrey (USACAN)" <Jeffrey.Snih@usdoj.gov>,
"Chan, Elvis M. (SF) (FBI)" <Elvis.Chan@ic.fbi.gov>, "Milligan, Julissa L. (Perkins Coie)"
<JMilligan@perkinscoie.com>, "Garrett, Lafayette M. (WF) (FBI)" <Lafayette.Garrett@ic.fbi.gov>
Subject: Re: Follow Up

?Good morning,

I've attached an additional list on behalf of the San Francisco Division:

DNC

Priority Requests

1. Un-redacted copies of Crowdstrike reports related to DNC incidents.

2. Logical/Physical Network Diagrams of DNC Networks

3. Any data logging the ingress and egress of data to/from the DNC networks, to include, but not limited to:

-Firewall Logs
-IDS/IPS or security device logs
-Netflow Logs
-PCAP data
-DNS Query Logs
-SMTP Logs
-Web Proxy Logs
-VPN Logs
-Network Device Logs

Secondary Requests

1. Disk/System Images for all compromised hosts, as listed on pages 67-68 of the DNC Incident Investigation
Report

2. Memory Images for all compromised hosts, as listed on pages 67-68 of the DNC Incident Investigation
Report

(Excerpt from Sussmann exhibit 147. See https://www.documentcloud.org/documents/22046130-dx-147_redacted.)

The compromised servers at the DNC had apparently not even been imaged to capture
any indicators of compromise before the June 2016 Crowdstrike remediation event:

| From: | Sussmann, Michael A. (Perkins Coie) |
|---|---|
| Sent: | Thursday, October 13, 2016 3:43 PM |
| To: | Chan, Elvis M. (SF) (FBI) |
| Cc: | Rich, Patricia R. (SF) (FBI); Newell, Sean (NSD) (JMD); Hawkins, E. A. (WF) (FBI); Sills, Jonathan P. (OGC) (FBI); Hooper, Joseph M. (CYD) (FBI); Cheeks II, James E. (CYD) (FBI); Milligan, Julissa L. (Perkins Coie) |
| Subject: | Re: Follow Up |

In theory, sure, but I'm checking to see if the data is with CrowdStrike now or at the DNC.

I'll start a new email and put you directly in touch with CrowdStrike.

Michael Sussmann  |  Perkins Coie LLP
P: 202.654.6333
www.perkinscoie.com/msussmann

From: "Chan, Elvis M. (SF) (FBI)" <Elvis.Chan@ic.fbi.gov>
Date: Thursday, October 13, 2016 at 2:55 PM
To: Michael <msussmann@perkinscoie.com>
Cc: "Rich, Patricia R. (SF) (FBI)" <Patricia.Rich@ic.fbi.gov>, "Newell, Sean (NSD) (JMD)" <Sean.Newell@usdoj.gov>, "Hawkins, E. A. (WF) (FBI)" <Adrian.Hawkins@ic.fbi.gov>, Jonathan Sills <Jonathan.Sills@ic.fbi.gov>, "Hooper, Joseph M. (CYD) (FBI)" <Joseph.Hooper@ic.fbi.gov>, "Cheeks II, James E. (CYD) (FBI)" <James.Cheeks@ic.fbi.gov>, "Milligan, Julissa L. (WDC)" <JMilligan@perkinscoie.com>
Subject: RE: Follow Up

Hi Michael,

Do you believe DNC/DCCC would be amenable to letting FBI computer forensics personnel onsite to conduct the imaging?

Regards,
  Elvis
==============
Elvis M. Chan
Supervisory Special Agent
Squad CY-1
San Francisco Division
Federal Bureau of Investigation
Work: 415-553-7605
Cell: [REDACTED]-6196
E-mail: elvis.chan@ic.fbi.gov

From: Sussmann, Michael A. (Perkins Coie) [mailto:MSussmann@perkinscoie.com]
Sent: Thursday, October 13, 2016 10:58 AM
To: Chan, Elvis M. (SF) (FBI) <Elvis.Chan@ic.fbi.gov>

Cc: Rich, Patricia R. (SF) (FBI) <Patricia.Rich@ic.fbi.gov>; Newell, Sean (NSD) (JMD) <Sean.Newell@usdoj.gov>; Hawkins, E. A. (WF) (FBI) <Adrian.Hawkins@ic.fbi.gov>; Sills, Jonathan P. (OGC) (FBI) <Jonathan.Sills@ic.fbi.gov>; Hooper, Joseph M. (CYD) (FBI) <Joseph.Hooper@ic.fbi.gov>; Cheeks II, James E. (CYD) (FBI) <James.Cheeks@ic.fbi.gov>; Milligan, Julissa L. (Perkins Coie) <JMilligan@perkinscoie.com>

**Subject: Re: Follow Up**

Elvis,

Here's the information from CrowdStrike:

The images requested by the FBI are approx. 3.1 TB of data. Pulling, encrypting, and transferring the data, and shipping the drives will require approx. 10 hours of labor, plus associated expenses.

Our clients are paying $375/hr = $3,750 in fees.
Add approx $140 for the drive to which images will be transferred.
Add shipping rates.
And we're looking at around $4,000.00

(There are no legal fees from my firm incorporated into this estimate — it's just the time, materials and incidental costs for CrowdStrike.)

Please advise.

Michael

**Michael Sussmann | Perkins Coie LLP**
P. 202.654.6333
www.perkinscoie.com/msussmann

(Excerpt from Sussmann exhibit 151. See https://www.documentcloud.org/documents/22046128-dx-151_redacted.)

These emails indicate that for the October 7, 2016 joint attribution statement released by DHS/ODNI[20], other materials in the government's possession must have been used to support attribution for the hack to Russia. Was it the August 7, 2016 attribution analysis provided by Dagon and Antonakakis that the government relied on? Or perhaps other materials provided by the Clinton-connected cyber researchers?

If so, it opens the door to a possibility the government was fooled into making a false attribution and is now fearful of the geopolitical implications of walking back claims that Russia hacked the Democratic National Committee. Applicant asks this court to consider in context the lengthy chain of events between April 2016 and October 2016, including the launch of Crossfire Hurricane, the opening of numerous investigations of Trump associates, and a September 2016 application for a FISA warrant (that was later re-submitted and granted against Carter Page in October), and the FBI hadn't done the first steps in verifying there was any hacking activity.

---

[20] See
https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national.

### C.  The Request Is Structured To Cover Only Material Needed

Applicant's request is narrowly tailored to matters before the grand jury specific to the cyber researchers in this case. It is intended both to elucidate the government's disclosures to the grand jury as well as the government's discretion in placing reliance on these cyber researchers in the performance of their investigation.

The public's interest is immense and it is foreseeable that based on the requested records, the public may push for changes to laws regarding the government's requirements in conduct before grand juries and in investigations when they are working with political operatives.

Of far greater importance, Applicant believes these materials are critically needed to prevent a serious injustice. Based on information developed by the Applicant through documents received and sources developed, Applicant believes the *Netyksho* case brought by Special Counsel Robert Mueller to be an exercise of an ill-conceived cover-up campaign.

### PRAYER FOR RELIEF

The government has invited this action by choosing to work with cyber researchers connected to Hillary Clinton and suspicious allegations of a secret communications channel between Trump and Putin. Surely, the government could have selected any number of other cyber researchers to fulfill any investigative needs they had.

There is a sufficient question raised as to the potential for prosecutorial misconduct and this court should move to defend the integrity of the judicial system. The court should give consideration to ordering the provision of all materials connected to Rodney Joffe, David Dagon, and Manos Antonakakis to the court for the purposes of an In-Camera review. This would afford the court the ability to better assess the need for disclosure in consideration of the public interest, and the scope of government abuses. The government should additionally provide a log summarizing all documentary evidence as well as any known interactions relating to these cyber researchers. Depending on the volume of materials, a special master may reduce the burden on the court.

In full consideration of the facts, Applicant prays that this court will act appropriately by ordering the release of:

a. All portions of Grand Jury materials relating to the roles of Rodney Joffe, Manos Antonakakis, and David Dagon in the investigation of the hack of the Democratic National Committee;

b. Any transcripts of underlying grand jury testimony or grand jury exhibits that relate to evidence provided or influenced by Joffe, Dagon, or Antonakakis;

c. Any transcripts of underlying grand jury testimony or grand jury exhibits that relate to evidence provided or influenced by entities tied to Rodney Joffe, including: (a) Packet Forensics (b) Neustar (c) ERP Services (d) Vostrom Holdings; (e) Internet Media Network;

d. Any transcripts of underlying grand jury testimony or grand jury exhibits that relate to evidence provided or influenced by the Defense Advanced Research Projects Agency ("DARPA") and the Department of Defense (DOD).

If the work product of the cyber researchers had a material influence on *Netyksho* as Applicant believes, the court may be well-advised to consider additional orders, including but not limited to issuing an order for the cyber researchers to preserve all evidence in their possession for future consideration as Brady evidence.[21]

Respectfully submitted,

Dated: December 7, 2023

Ryan Milliron, Pro Se
PO Box 516
211 W Exchange St
Spring Lake, MI 49456

---

[21] This creates an odd dynamic, as the cyber researchers had an adversarial relationship with the government during the investigation of Special Counsel John Durham and fought subpoenas and requests issued during the course of that investigation. Because the government appears to have previously relied on them for work relating to the *Netyksho* case, the researchers must eventually produce all information relating to the Alfa Bank allegations and the investigation into the hack of the DNC to both parties and any invocation of their 5th amendment protections could deprive the *Netyksho* defendants of Brady evidence.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE APPLICATION FOR ACCESS § 
TO GRAND JURY MATERIALS §    Case No. _____
RELATING TO HACK OF §
DEMOCRATIC NATIONAL §
COMMITTEE §

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 7, 2023, he caused to be mailed, via postage prepaid first-class mail, and emailed, a copy of the **APPLICATION FOR ACCESS TO GRAND JURY MATERIALS RELATING TO THE HACK OF THE DEMOCRATIC NATIONAL COMMITTEE** filed today in the above-captioned matter to the following:

- Office of the Attorney General
  Department of Justice
  950 Pennsylvania Avenue, NW
  Washington DC 20530

- United States Attorney
  District of Columbia
  601 D Street, NW
  Washington DC 20530
  USADC.ServiceCivil@usdoj.gov

Dated: December 7, 2023

Ryan Milliron, Pro Se
PO Box 516
211 W Exchange St
Spring Lake, MI 49456